IT IS SO ORDERED.

Signed 10-14-2010

ROGER L. EFREMSKY
U.S. Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re<br><br>LIGHTHOUSE LODGE, LLC,<br><br>       Debtor. | Case No. 09-52610-RLE<br><br>Chapter 11 |

**MEMORANDUM DECISION ON OBJECTIONS
TO CONFIRMATION OF CHAPTER 11 PLANS**

  Pursuant to the Court's Scheduling Order for Trial on Objections to Confirmation of Chapter 11 Plans and Objection to Claim of Geneva Real Estate Investments, Inc. (the "Scheduling Order"), the Court identified three legal issues that to be resolved in advance of confirmation hearing set for November 15, 2010. These issues are: (1) Whether the Debtor's "deceleration" of ORIX's loan in the Debtor's Second Amended Plan of Reorganization Dated May 3, 2010 (the "Debtor's Plan") is permissible under the Bankruptcy Code; (2) Whether ORIX's release of itself in its Creditor's Second Amended Plan of Liquidation (Dated May 4, 2010)(the "ORIX Plan") is permissible; and (3) Whether ORIX is an "insider" in the ORIX Plan.

  The Court ordered the Debtor, Geneva Real Estate Investments, Inc. ("Geneva"), and

MEMORANDUM DECISION                           1

Case: 09-52610   Doc# 294   Filed: 10/14/10   Entered: 10/14/10 14:16:37   Page 1 of 18

ORIX to file simultaneous opening briefs and simultaneous reply briefs on the aforementioned issues pursuant to the deadlines specified in the Scheduling Order. The parties timely filed their briefs.

## I. PROCEDURAL BACKGROUND[1]

The Debtor filed this case under Chapter 11 of the Bankruptcy Code on April 9, 2009. The Debtor owns and operates a hotel business in Pacific Grove, California, known as the Lighthouse Lodge & Suites (the "Property"). The Debtor and its secured creditor ORIX Capital Markets, LLC ("ORIX") each filed a plan of reorganization, and the two parties filed a Joint Disclosure Statement for the Debtor's Plan and the ORIX Plan.

The Debtor's Plan proposes, among other things, to restructure ORIX's secured debt in the estimated amount of $8,644,489 by extending the maturity date to October 1, 2012, and fixing the interest at the original contract rate of 9%. The ORIX loan matured by its terms on October 1, 2009. The Debtor's Plan acknowledges that ORIX is an oversecured creditor and is entitled to prepetition and postpetition interest, fees, and costs, including reasonable attorneys' fees, subject to proof. The Debtor's Plan also proposes to modify several provisions of the loan agreement with ORIX, including provisions regarding interest preservation, the repair and maintenance reserve, the debt service reserve, and the insurance reserve. ORIX shall retain its lien on the Debtor's Property until the Property is sold or refinanced. ORIX's claim is impaired under the Debtor's Plan.

The ORIX Plan provides for the appointment of a liquidating agent who will commence a sale process and supervise the management of Debtor pending sale and claim distributions. ORIX asserts that it is entitled to interest at the default rate from the date of default. ORIX estimates that its claim is in the amount of $9,398,030 pursuant to the Joint Disclosure

---

[1] The following background is taken from the Court's docket and the pleadings filed by the parties herein. The information, which summarizes the relevant portions of the briefs, Debtor's Plan, and ORIX Plan, is intended to provide context to the Court's ruling herein and is subject to proof at trial. The Court makes no findings of facts and does not rule on admissibility at this time.

MEMORANDUM DECISION

2

Statement. The ORIX Plan also provides for release for any and all claims the estate may have against ORIX.

ORIX filed an objection to the Debtor's Plan. One of ORIX's objection is the "deceleration" of ORIX's claim which deprives ORIX of the accrued interest at the default rate. Debtor's loan agreements with ORIX provide that if the full outstanding principal and interest amounts are not paid on or before the natural maturity date or the accelerated maturity date, all accrued but unpaid interest and any other amounts due will bear interest of 4% above the contract rate of 9% until such amounts have been paid in full.

On June 15, 2010, Geneva filed an objection to the ORIX Plan, objecting to the release of ORIX and asserting that ORIX is an insider of the ORIX Plan, among other issues.

The Court held a preliminary hearing on the objections on July 8, 2010 and because the three issues are legal in nature, the Court ordered additional briefing. The Debtor, Geneva, and ORIX timely filed their briefs.

## II. DISCUSSION

### A. "Deceleration" of the ORIX Loan

The Debtor and Geneva argue that since ORIX's claim will be paid in full at the non-default interest rate pursuant to the three-year extension of the maturity date in the Debtor's Plan, this constitutes a "cure" of the default and ORIX is not entitled to default interest, pursuant to Great Western Bank & Trust v. Entz-White Lumber And Supply, Inc. (In re Entz-White Lumber And Supply, Inc.), 850 F.2d 1338 (9th Cir. 1988).

ORIX asserts that the Debtor's payments under the Debtor's Plan cannot be considered a "cure" because the loan has naturally matured and that to "cure" the default under Entz-White, the Debtor must "unimpair" ORIX's claim.

1. Applicability of In re Entz-White Lumber & Supply, Inc.

The Bankruptcy Code provides that a Chapter 11 plan shall provide adequate means for the plan's implementation, such as curing or waiving of any default or extension of a maturity

date or a change in an interest rate. 11 U.S.C § 1123(a)(5)(G) & (H).[2]

In Entz-White, the debtor, pursuant to the plan and upon confirmation, paid secured creditor Great Western the full principal balance owed and accrued interest at the contract rate under the promissory note, which matured by its own terms prior to the filing of the bankruptcy petition. Subsequently, Great Western filed a proof of claim which asserted that the debtor was liable for the post-maturity default interest.

Noting that the Bankruptcy Code does not define "cure," the Ninth Circuit adopted the definition of "cure" formed by the Second Circuit in In re Taddeo, 685 F.2d 24 (2nd Cir. 1982), that "[a] default is an event in the debtor-creditor relationship which triggers certain consequences . . . . Curing a default commonly means taking care of the triggering event and returning to pre-default conditions. The consequences are thus nullified. This is the concept of 'cure' used throughout the Bankruptcy Code." Entz-White, 850 F.2d at 1340 (quoting Taddeo, 685 F.2d at 26-27). Thus, the Ninth Circuit reasoned that "curing" a default returns the parties to pre-default conditions, as if the default had never occurred. Therefore, the debtor "is entitled to avoid all consequences of the default - including higher post-default interest rates." Id., at 1342.

Great Western argued that despite the broad language of section 1123 allowing a debtor to cure any default, only those defaults which resulted in acceleration could be cured, citing to § 1124(2)[3] as support for its argument. According to Great Western, because the note at issue

---

[2] Unless otherwise indicated, all section and rule references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1330 and the Federal Rules of Bankruptcy Procedure, Rules 1001-9037.

[3] Section 1124(2) provides that a class of claims or interests is impaired under a plan unless, with respect to each claim or interest of such class, the plan –
    (2) notwithstanding any contractual provision or applicable law that entitles the holder of such claim or interest to demand or receive accelerated payment of such claim or interest after occurrence of a default –
        (A) cures any such default that occurred before or after the commencement of the case under this title ...;
        (B) reinstates the maturity of such claim or interest as such maturity existed before such default;
        (C) compensates the holder of such claim or interest for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law;
        (D) if such claim or such interest arises from any failure to perform a nonmonetary obligation, . . . compensates the holder of such claim or such interest (other than the debtor or an insider) for any actual pecuniary loss incurred by such holder as a result of such failure; and
        (E) does not otherwise alter the legal, equitable, or contractual rights to which such claim or interest entitles the holder of such claim or interest.

naturally matured before the bankruptcy, there was no acceleration and the debtor had to pay the default interest rate in the contract. The court rejected this argument. Instead, the court held that the "natural reading" of references to "default" in §§ 1123 and 1124 "is that plans may cure all defaults without impairing the creditor's claim, and that such defaults include, but are not limited to, those defaults resulting in acceleration[,]" subject to exception for certain types of default enumerated in § 1124(2). Id., at 1341. Therefore, the court held that "the power to cure under the Bankruptcy Code authorizes a plan to nullify all consequences of default, including avoidance of default penalties such as higher interest." Id., at 1342.

In this case, the preliminary question is whether there is a "cure" under the treatment of ORIX in the Debtor's Plan. Pursuant to the Debtor's Plan, ORIX's loan will accrue interest at the original contract rate of 9% from the date of confirmation and the original maturity date of October 1, 2009 will be extended to October 1, 2012. Prepetition and postpetition fees, costs, and reasonable attorneys' fees will be added to the principal amount outstanding on the date of confirmation and will accrue interest at the rate of 9%. The entire obligation will be amortized over 30 years, payable in monthly payments of $71,542, with the remaining balance due and payable on October 1, 2012. In addition, the Debtor's Plan modifies several provisions of the loan pertaining to reserve requirements.

Despite the Debtor's and Geneva's characterization, the Debtor's Plan does not "cure" the default under the ORIX's loan. Pursuant to the definition of "cure" enunciated in Entz-White, ORIX is not returned to pre-default status under the Debtor's Plan.

First, for a loan that has matured naturally, any "cure" would have to return the maturity date to the pre-default status, namely reinstating the obligation's original maturity date and making the obligation immediately due and payable. Id., at 1342, citing Seidel v. Larson (In re Seidel), 752 F.2d 1382, 1386 (9th Cir. 1985). The debtor in Entz-White satisfied this criteria by making the obligation immediately due and payable under the plan. Entz-White, 850 F.2d at 1342. The Debtor argues that contrary to a loan that naturally matures prepetition as in Entz-White, a loan that matures naturally postpetition "can be extended in a plan without affecting the

MEMORANDUM DECISION 5

application of the cure provisions of Chapter 11 because the maturity date did not go into effect." <u>Lighthouse Lodge, LLC's Opening Brief Regarding Purely Legal Issues On Objections To Confirmation of Chapter 11 Plans</u>, p. 5:24-26. The Debtor provides no supporting legal authority for this proposition. Accepting this proposition would produce the absurd result that a debtor may extend a loan that matured postpetition for five, ten, or even twenty years under a plan of reorganization and yet may still describe the loan as being "cured" and avail it of the cure provisions of §§ 1123 and 1124. By extending the time for complete payment of the ORIX's loan beyond the time originally established in the loan documents, the Debtor is modifying ORIX's rights under its plan.

Second, the Debtor's Plan calls for amortizing the entire obligation over 30 years, with the remaining outstanding balance due on October 1, 2012, and modifies several reserve provisions of the loan documents. Given these changes, ORIX cannot be said to have been returned to its pre-default status. Under the Debtor's Plan, a new maturity date, a new amortization schedule, and new terms are substituted in lieu of the prior obligation. While a plan may propose these modifications by § 1123,[4] these provisions do not amount to a complete cure within the meaning of <u>Entz-White</u>.

The focus on § 1124(2) by ORIX and the Debtor misses the point. The authority to cure is found in § 1123(a)(5)(G), not § 1124(2). See <u>In re Taddeo</u>, 685 F.2d at 29 ("Section 1124(2) merely takes away the creditor's right to vote in the event of cure; the authority to cure is found in § 1123(a)(5)(G) in plan language similar to § 1322(b)."). Section 1124 determines who has the right to vote on a plan, and it carves out a small exception to impairment by providing that curing a default, even though it inevitably changes a contractual acceleration clause, does not impair a creditor's claim. <u>Id.</u>, at 28. Pursuant to <u>Entz-White</u>, a debtor may cure a default under § 1123(a)(5)(G) "even if a party with a claim cured in this way would be impaired under § 1124." <u>Entz-White</u>, 850 F.2d at 1340. Stated in a different way, §1123 allows a debtor to cure a default,

---

[4] The Court makes no determination at this juncture as to the whether the Debtor's Plan is feasible, fair and equitable, or proposed in good faith.

and if the cure also satisfies the requirements of §1124(2), the cured claim would be unimpaired.

In this case, because the Debtor's Plan does not cure the default on the ORIX obligation, Entz-White is not applicable. Likewise, because there is no cure, the Court need not determine the applicability of § 1124(2).

## 2. Default Interest Rate for an Oversecured Creditor

Because Entz-White does not control in this case, the next step in the analysis is whether the Bankruptcy Code allows the enforcement of the default interest rate for an oversecured creditor.

The parties do not dispute that ORIX is an oversecured creditor. Section 506(b) provides that an oversecured creditor is entitled to postpetition interest on its claim, and any reasonable fees, costs, or charges provided for under the agreement or State statute under which such claim arose. 11 U.S.C. § 506(b). However, neither this section nor the legislative history indicates what the interest rate shall be.

In determining whether the contractual default rate should apply, the Ninth Circuit recently adopted the rule, used by the majority of federal courts, that "the bankruptcy court should apply a presumption of allowability for the contracted for default rate, provided that the rate is not unenforceable under applicable nonbankruptcy law." General Electric Capital Corp. v. Future Media Productions, Inc., 536 F.3d 969, 974 (9th Cir. 2008)(internal citations omitted); see also In re Laymon, 958 F.2d 72, 75 (5th Cir. 1992), *cert denied* 506 U.S. 917 (1992); In re Terry Ltd. P'ship, 27 F.3d 241, 243 (7th Cir. 1994).

Under California law, "liquidated damages" mean the amount of compensation to be paid in the event of breach of contract, sum of which is fixed and certain by agreement. Chodos v. West Publishing Co., 292 F.3d 992, 1002 (9th Cir. 2002). Prior to 1978, California Civil Code § 1671 authorized the assessment of agreed-upon and anticipated damages "only when the fixing of the actual damages which would be sustained upon a breach would be 'impracticable' or 'extremely difficult.'" Garrett v. Coast & Southern Federal Savings & Loan Ass'n., 9 Cal.3d 731, 738 (Cal. 1973). "There was also a judicially created requirement that liquidated damages had to

be the result of a 'reasonable endeavor' by the parties to estimate fair compensation for the expected loss." In re VEC Farms, LLC., 395 B.R. 674, 685 (Bankr.N.D.Cal. 2008); Garrett, 9 Cal. 3d at 739.

However, effective July 1978, § 1671 of the Civil Code was amended to provide a new general rule favoring liquidated damages except in certain consumer cases and residential leases. The amended California Civil Code § 1671(b) provides, in relevant parts, "a provision in a contract liquidating the damages for the breach of the contract is valid unless the party seeking to invalidate the provision establishes that the provision was unreasonable under the circumstances existing at the time the contract was made." Under this current version, "the liquidated damages need only bear a reasonable relationship to the range of harm that the parties might reasonably have anticipated when they entered into the contract." VEC Farms, 395 B.R. at 685; Ridgley v. Topa Thrift & Loan Ass'n, 17 Cal.4th 970, 977 (Cal. 1998). In the absence of such relationship, a contractual clause purporting to predetermine damages must be construed as a penalty. Ridgley, 17 Cal.4th at 977.[5]

In this case, the Debtor and Geneva oppose the assessment of the default rate and have the burden of proof that the applicable provisions were unreasonable at the time the contract was made. Cal. Civ. Code. § 1671(b); Weber, Lipshie & Co. v. Christian, 52 Cal.App.4th 645, 654 (1997). In addition to considering the circumstances existing at the time of the making of the contract, other relevant factors include, but are not limited to, the relative equality of the bargaining power of the parties, whether the parties were represented by counsel at the time, the anticipation of the parties that proof of actual damages would be costly or inconvenient, the difficulty of proving causation and foreseeability, and whether the liquidated damages provision is included in a form contract. Cal.Law Revision Comm. Comment, Civil Code § 1671.

However, for the purposes of the confirmation hearing, a determination of the applicability of the default interest rate may be unnecessary. Having found that the holding in

---

[5] Ridgley affirmed the analysis in Garrett that charges for delay in making payments must be reasonably related to actual damages for delay. Ridgley, 17 Cal.4th at 981, n5.

MEMORANDUM DECISION                                                                                      8

Entz-White does not apply, the Debtor may avail itself to § 1129(b)(2) by essentially proposing to pay ORIX an interest rate of 9% on its secured claim, with a maturity date of October 1, 2012, at which time the remaining obligation will be paid in full. On its face and without considering any potential confirmation issues or objections, the Debtor's Plan is permissible under the Bankruptcy Code. See 11 U.S.C. § 1123(a)(H).

The issue of the applicability of the default interest rate is in essence a claims issue, a ruling on which may be premature. Neither Geneva nor the Debtor has objected to ORIX's proof of claim, which included amounts for default interest, late charges, yield maintenance, expenses, and attorneys' fees, among other items. ORIX's proof of claim, assuming it was properly executed and filed, is prima facie evidence of the validity and amount of the claim. Fed.R.Bankr.Proc. 3001(f). Furthermore, ORIX has not filed a motion pursuant to § 506(b) and Rule 3012 to determine the value of its claim. Any determination on the allowance of ORIX's claim, whether prepetition or postpetition, will likely require an evidentiary hearing on the reasonableness of the interest, late charges, expenses, and attorneys' fees and costs as well as a breakdown of each component.

Based on the foregoing, the Court finds that the treatment of ORIX's claim under the Debtor's Plan does not "cure" Debtor's default pursuant to Entz-White. While the use of the word "decelerated" in the Debtor's Plan is misleading and incorrect, the Debtor is not required to adopt the default interest rate for interest accrual during the life of the Debtor's Plan. However, ORIX may be entitled to the default interest rate in calculating its claim if the rate is not unenforceable under applicable nonbankruptcy law. At this time, the Court makes no finding on the reasonableness or validity under state law of the default interest rate as it pertains to ORIX's claim.

To the extent that the Debtor's Plan states no default interest shall accrue from the time of default on ORIX's claim, the language should be modified accordingly as discussed herein. References to "deceleration" should also be deleted.

## B. Release of ORIX

The Debtor and Geneva argue that the ORIX Plan contains an exculpation provision that improperly releases non-debtors, namely ORIX itself. They rely on Resorts Int'l, Inc. v. Lowenschuss (In re Lowenschuss), 67 F.3d 1394 (9th Cir. 1995) to support this proposition. ORIX maintains that the release provision simply restates the effects of judicial estoppel and *res judicata* upon the confirmation of the plan.

The ORIX Plan, in ¶ 8.2, contains the following exculpation clause:

> As of the Effective Date, this Plan will be deemed to satisfy, waive, and release in full any and all claims of the Debtor or the Estate against any of the officers, directors, agents, advisors, servicers, representatives, consultants, attorneys, or accountants of the Proponent (whether as the holder of the ORIX Loan or any other capacity) from any claims arising out of or in connection with any act or failure to act in connection with rights and duties arising under or related to the Case from the Petition Date to and including the Effective Date, except any claims expressly created or preserved under the terms of this Plan or any documents executed, or to be executed, in connection with this Plan.

In addition, the paragraph contains the following language:

> Except as expressly provided in this Plan or any other document executed or to be executed in connection with this Plan, neither the Proponent (in any capacity) nor any of its officers, directors, shareholders, partners, members, managers, agents, advisors, representatives, servicers, consultants, attorneys, or accountants, will have any liability to or on behalf of the Estate for actions taken or omitted to be taken under or in connection with this Plan or the Case from the Petition Date to and including the Effective Date.

ORIX's *res judicata* argument has the effect of putting the cart before the horse. ORIX is correct on the *res judicata* effect of confirmation. See 11 U.S.C. § 1141(a). Therefore, to the extent that the Debtor and Geneva find the exculpation provision objectionable, they have all the more reason to object now before confirmation. "Once a bankruptcy plan is confirmed, it is binding on all parties and all questions that could have been raised pertaining to the plan are entitled to *res judicata* effect . . . . Creditors who do not wish to release third party debtors pursuant to the . . . plan of reorganization should object to confirmation of the plan on the ground that such a plan provision is violative of section 524 and not within the power, even jurisdiction, of the bankruptcy court." Trulis v. Barton, 107 F.3d 685, 691 (9th Cir. 1995) (citations omitted).

Assuming the exculpation provision is improper, the Debtor and Geneva would be barred from collaterally challenging the provision after confirmation of the ORIX Plan. See In re Pardee, 193 F.3d 1083, 1086 (9th Cir. 1999) ("This court has recognized the finality of confirmation orders even if the confirmed bankruptcy plan contains illegal provisions.").

    The release provision at issue is similar to those that insulate a creditor's committee from liability in a chapter 11 plan, which is a good starting point for our analysis. Section 1103(c) grants to official creditors' committees broad authority in formulating a plan of reorganization and performing "such other services as are in the interest of those represented." 11 U.S.C. § 1103(c). Section 1103(c) also gives rise to "an implicit grant of limited immunity." In re Drexel Burnham Lambert Group, Inc., 138 B.R. 717, 722 (Bankr.S.D.N.Y. 1992). Hence, a plan may contain a release provision insulating a committee and its members from liability except from gross negligence or willful misconduct. See Vasconi & Associates, Inc. v. Credit Manager Association of California, 1997 WL 383170, *4 (N.D.Cal. 1997); In re PWS Holding Corp., 228 F.3d 224, 246-47 (3rd Cir. 2000);

    This release of liability except from gross negligence or willful misconduct has been extended to plan proponents other than a committee. In In re WCI Cable, Inc., 282 B.R. 457 (Bankr.D.Or. 2002), the bankruptcy court was confronted with objections to the various release, exculpation, injunction and indemnification provisions in the debtor's plan. One of the exculpation provisions sought to limit the liability of the debtors, who were the plan proponents, "for any of their actions or omissions to act with respect to the [debtors'] bankruptcy proceedings, except for willful misconduct or gross negligence." Id., at 477.[6] Because the provision would release the debtors and their officers, members, directors, employees, representatives, attorneys, accountants, financial advisors, agents, among others, the bankruptcy court observed that "[d]ifferent liability standards may be appropriate and/or applicable under the Bankruptcy Code to these different entities and individuals in various circumstances in performing their respective functions postpetition in bankruptcy, and the lines separating actions

---

[6] The exculpation provision in WCI Cable releasing the debtors from liability extended to all parties.

protected by immunity from actionable conduct are neither clearly nor easily drawn." Id., at 478. The court also pointed out that unlike a creditors' committee, these parties did not have statutory immunity. Id., at 478. Nevertheless, noting that the debtors had a legitimate concern because the cases were bitterly contested, the court approved the exculpation clause on the condition that the exculpation exceptions were extended to cover negligence and breaches of fiduciary duty, in addition to gross negligence and willful misconduct as already stated in the release. Id., at 479-80.

Other courts have approved exculpation provisions that limited liability to gross negligence, willful misconduct, or breach of fiduciary duty. See In re PWS Holding Corp., *supra* (approved exculpation provision releasing debtors, reorganized debtors, committee, and their officers, directors, employees, advisors, professionals or agents from liability except from willful misconduct or gross negligence); In re Western Asbestos Co., 313 B.R. 832, 846-47 (Bankr.N.D.Cal. 2003) (approved release provision in favor of debtors, committee, futures representative, and their respective agents except for willful misconduct); In re Firstline Corp., 2007 WL 269086 (Bankr.M.D.Ga. 2007)(approved exculpation clause for the debtor, trustee, the committee and its members, and their respective advisors, attorneys, consultants or professionals with exception for gross negligence, willful misconduct, or breach of fiduciary duty); In re Enron Corp., 326 B.R. 497 (S.D.N.Y. 2005)(bankruptcy court approved exculpation provision in favor of debtors, creditors' committee, employee committee, trustees, and their respective officers, employees, attorneys, and agents that excluded gross negligence or willful misconduct).

The release provision here, as well as the circumstances, is most similar to that in Edgewood Centre v. Flash Island, Inc. (In re Whispering Pines Estates, Inc.), 370 B.R. 452 (1st Cir. BAP 2007). In that case, secured creditor Flash Island proposed a chapter 11 plan of liquidation which included a provision releasing all claims the trustee, debtor and the estate "has or might have against the Proponent or its participants and any of their equity holders, directors, managers, officers, employees, accountants, attorneys, consultants, and other agents." Id., at 456. The estate did have two causes of action whose merits and value were uncertain, one of which

Case: 09-52610   Doc# 294   Filed: 10/14/10   Entered: 10/14/10 14:16:37   Page 12 of 18

was a right of action to avoid as fraudulent transfers both Flash Island's second mortgage and the debt it secured. Id., at 454. The debtor objected to the release provision. The BAP viewed the release as two distinct releases rolled into one: "a 'settlement or adjustment of claims belonging to the debtor and the estate' within the meaning of § 1123(b)(3)(A); and a release (or limitation of liability, or grant of immunity) of a party responsible for implementing the plan." Id., at 460. Concerning the former, Flash Island asserted that the same standard for approval of compromises outside of a plan should be applied, which accord a certain deference to the proponent. However, the court held that "[w]here, as here, the 'settlement' is not put forth by a fiduciary having authority and responsibility to act for the estate and who negotiated it in an arm's length transaction, but unilaterally by the very party who would be receiving the benefit of the release, there is no cause for deference in the matter" and remanded the matter to the bankrutpcy court for an evidentiary hearing on the propriety of the release as a settlement of claims against Flash Island. Id., at 461. As for the release of a plan proponent, given that the release was categorical and not even gross negligence or willful misconduct would be actionable, the court, citing WCI Cable, held that the release was inconsistent with the requirements of the Bankrutpcy Code. Id., at 461.

The Court endorses the logic of the bifurcation analysis in Whispering Pines Estates. Like the creditor Flash Island in Whispering Pines Estates, ORIX also urges the Court to view the release provision as a compromise or settlement of any and all claims between ORIX on the one hand and the Debtor and the estate on the other, pursuant to In re A&C Properties, 784 F.2d 1377 (9th Cir. 1986). As in Whispering Pines Estates, the "settlement" here is not put forth by a fiduciary acting for the estate, is not negotiated in an arm's length transaction, and is proposed unilaterally by the party who receives the benefit of the release. Thus, to the extent the law favors compromise and provides for a wide deference to the wisdom of the proponent's view of the settlement, such deference will not be given here on these facts. See Whispering Pines Estates, 370 B.R. at 461. ORIX, as the party proposing the "settlement," has the burden of persuading this Court that the release is fair, equitable, reasonable, and in the best interests of the

estate. See A&C Properties, 784 F.2d at 1381-82. Unlike Whispering Pines Estates, there does not appear to be any claims against ORIX held by the Debtor or the estate,[7] but the parties may offer evidence at the evidentiary hearing as to the propriety of the release, including any potential claims against ORIX.

The second part of the analysis is the release of liability of ORIX as the plan proponent. Although the release provision does except those claims preserved or provided for in the ORIX Plan or documented or executed in connection with the ORIX Plan, it does not provide for exceptions for gross negligence or willful misconduct. As noted in the above cases, this is improper and would preclude confirmation of the plan. See Whispering Pines Estates, 370 B.R. at 461; WCI Cable, 282 B.R. at 479-80; Western Asbestos Co., 313 B.R. at 846-47. The Court will approve the release provision if ORIX adds exceptions to cover gross negligence or willful misconduct. Despite the fact that the court in WCI Cable required additional exceptions for negligence and breaches of fiduciary duty, the Court does not find that these exceptions are necessary here because the release only limits liability to the Debtor and the estate (the release provision in WCI Cable covered all parties), the time period covered by the release is limited to post-petition acts through the effective date of the plan, and the plan will be implemented by a liquidating agent who is not a released party here.[8]

In addition, as a matter of clarification, although ORIX argues that the release only pertains to claims of the Debtor and the estate, the phrase "on behalf of the Estate" in ¶ 8.2, p. 34:24, may be interpreted to include a release of any claims by third parties against the releasees for actions taken on behalf of the estate. To avoid confusion, the last sentence in the paragraph should be modified to read ". . . will have any liability to the Estate for actions taken . . ." and the phrase "on behalf of" should be deleted.

---

[7] Geneva, in its Objection To Second Amended Plan Of Liquidation Proposed By ORIX Capital Markets, LLC, referenced potential preference claims against ORIX, but it did not mention these potential claims in its briefs.

[8] The ORIX Plan has separate provisions that provide for the liability of the liquidating agent. See ORIX Plan, ¶ 7.2.9. Although nominated by ORIX, the appointment of the liquidating agent is subject to court approval. ORIX Plan, ¶ 7.2.1.

The reliance on § 524(e) by the Debtor and Geneva is misplaced. Lowenschuss clearly holds that bankruptcy courts do not have the equitable power under § 105(a) to discharge the liabilities of non-debtors through chapter 11 plan confirmations, contrary to the provisions of § 524(e). Lowenchuss, 67 F.3d at 1401-02. However, the claims that ORIX proposes to release in ¶ 8.2 of the ORIX Plan are limited to claims belonging to the Debtor or the bankruptcy estate. Indeed, § 524(e) specifically states that "discharge of a debt of a debtor does not affect the liability of any other entity on, or the property of any other entity for, *such debt*." 11 U.S.C. § 524(e)(emphasis added). Here, the release provision is not attempting to release ORIX from any debts of the Debtor, nor does it shield ORIX from liability to creditors. Rather, the claims at issue, if any, are assets of the bankruptcy estate. See In re WCI Cable, Inc., 282 B.R. at 468-69 (Section 524(e) argument inapplicable when the claims that the debtors propose to release belong to the debtors and are assets of the bankruptcy estates); In re Western Asbestos Co., 313 B.R. at 846-47, citing WCI Cable and PWS Holding Corp..

### C. Whether ORIX is an "insider"

Geneva and the Debtor assert that ORIX must be considered an insider because under the ORIX Plan, ORIX will control the Debtor upon confirmation. They argue that ORIX cannot serve as its own consenting impaired class for voting purposes.

The Bankruptcy Code defines an "insider" when the debtor is a corporation to include: (1) director of the debtor; (2) officer of the debtor; (3) person in control of the debtor; (4) partnership in which the debtor is a general partner; (5) general partner of the debtor; or (6) relative of a general partner, director, officer, or person in control of the debtor. 11 U.S.C. § 101(31)(B). However, the classification of an "insider" is not limited to the statutory definition. Miller v. Schuman, 81 B.R. 583, 586 (9th Cir. BAP 1987). In determining who is a non-statutory insider, the courts "focus on the closeness of the parties and the degree to which [the party] is able to exert control or influence over the debtor." Id., at 586. Thus, an "insider status may be based on a professional or business relationship with the debtor, in addition to the Code's per se classifications, where such relationship compels the conclusion that the individual or entity has a

relationship with the debtor, close enough to gain an advantage attributable simply to affinity rather than to the course of dealings between the parties." Friedman v. Sheila Plotsky Brokers, Inc. (In re Friedman), 126 B.R. 63, 70 (9th Cir. BAP 1991).

While ORIX is the Debtor's largest secured creditor, neither the Debtor nor Geneva alleges that ORIX did not transact business at arm's length, exerted undue influence, or received preferential treatment. Indeed, even if a creditor has a strong bargaining position in dealing with the debtor, it does not necessarily give rise to insider status so long as the parties transact their business at arm's length. Id., at 70. The only allegation that ORIX is an insider is by virtue of its position as a plan proponent and that it will control the Debtor if its plan is confirmed.

A determination of insider status focuses on the party's relationship with the debtor. See Collier on Bankruptcy, ¶ 101.31, p. 101-140 (16th ed. 2009) ("An 'insider' generally is an entity whose close relationship with the debtor subjects any transactions made between the debtor and such entity to heavy scrutiny.") Similarly, the Bankruptcy Code defines an "insider" as a "person *in control of the Debtor.*" 11 U.S.C. § 101(31)(B)(iii)(emphasis added). To the extent that Geneva is arguing ORIX is an insider on the sole basis that it is the plan proponent, the argument has no statutory basis, and Geneva has not provided the Court with any case law to support such a proposition.

The Debtor and Geneva argue that because ORIX will control the Debtor after confirmation, it has insider status for purposes of § 1129(a)(10). All of the cases cited by the Debtor and Geneva involve a party that has an existing relationship or existing conduct that qualified it as an insider. Here, the Debtor and Geneva allege insider status based on a future event, namely the implementation of the ORIX Plan, for the purpose of pre-confirmation voting.

To qualify for per se insider status, "actual control (or its close equivalent) is necessary for a person or entity to constitute an insider under § 101(31)'s 'person in control' language." Schubert v. Lucent Technologies, Inc. (In re Winstar Communications, Inc.), 554 F.3d 382, 396 (3rd Cir. 2009). The word "actual" is defined as "existing in fact; typically as contrasted with what was intended, expected, or believed." Oxford Dictionary, www.oxforddictionaries.com

(2010). Based on the record before the Court, there is no evidence that ORIX has actual control of the Debtor, and the Debtor and Geneva do not appear to allege as much. What the Debtor and Geneva are alleging is "expected" control, which is insufficient to qualify for per se insider status.

In determining non-statutory insider status, the question "is whether there is a close relationship [between debtor and creditor] and whether there is anything other than closeness to suggest that any transactions were not conducted at arm's length." <u>Anstine v. Carl Zeiss Meditec AG (In re U.S. Medical)</u>, 531 F.3d 1272, 1277 (10th Cir. 2008). There is no suggestion that the relationship between ORIX and the Debtor is anything more than a debtor-creditor relationship or that any of the loan transactions were not conducted at arm's length. Again, neither the Debtor nor Geneva has provided any legal authority to support the proposition that a non-statutory insider status may be based solely on a future transaction or event. As ORIX noted in its brief, the Debtor's and Geneva's argument would render members of an unsecured creditors' committee insiders simply because they proposed a plan which allows them to nominate a liquidating agent.

The Debtor, in its reply brief, asserts that whether ORIX is an insider is a question of fact and requires an evidentiary hearing. However, ORIX's post-confirmation role is set out in its plan and is not a subject of dispute. Neither is ORIX's role as the plan proponent. Thus, the Court finds that ORIX is not an insider of its own plan by virtue of its position as a plan proponent and that ORIX is not an insider on the basis of its post-confirmation relationship with the Debtor under the ORIX Plan.

### III. CONCLUSION

Based on the foregoing, the Court overrules the objection of the Debtor and Geneva that ORIX is an insider by virtue of its role as a plan proponent and its post-confirmation relationship with the Debtor under the ORIX Plan.

The release provision in the ORIX Plan may be proper if modifications are made as discussed herein and its approval is subject to proof at the evidentiary hearing as to whether it is

fair, equitable, and reasonable. The Court will not rule on the objection at this time.

As to the issue of the default interest rate, the Court determines that the Debtor's Plan does not cure the default as it relates to ORIX's loan and because ORIX is an oversecured creditor, ORIX may be entitled to default interest rate on its claim if not unenforceable under applicable nonbankruptcy law. However, the Court will take up this issue upon a motion to value ORIX's claim or an objection to ORIX's claim. References in the Debtor's Plan to "deceleration" and no default interest on ORIX"s claim should be modified consistent with this Memorandum Decision.