**Entered on Docket
December 14, 2010
GLORIA L. FRANKLIN, CLERK
U.S BANKRUPTCY COURT
NORTHERN DISTRICT OF CALIFORNIA**



**The following constitutes
the order of the court. Signed December 14, 2010**

_____
**Stephen L. Johnson
U.S. Bankruptcy Judge**
_____

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re<br><br>LIGHTHOUSE LODGE, LLC,<br><br>Debtor. | Case No. 09-52610-SLJ<br><br>Chapter 11 |

**MEMORANDUM DECISION ON CONFIRMATION OF
PLANS OF REORGANIZATION AND OBJECTION TO CLAIM**

**I.   INTRODUCTION**

On November 15, 16 and 17, 2010, the court conducted a trial to determine whether either of the plans of reorganization submitted in this case could be confirmed. The debtor, Lighthouse Lodge, LLC (the "Debtor") proposed a Second Amended Plan of Reorganization (the "Debtor's Plan"), which was modified prior to trial and was supported by Geneva Real Estate Investments, Inc. ("Geneva"). ORIX Capital Markets, LLC ("ORIX"), a secured creditor in this case, filed a competing plan entitled Second Amended Plan of Liquidation (the "ORIX Plan"), also modified prior to trial. The parties filed a Joint Disclosure Statement dated May 4, 2010, in support of their

plans.

The Debtor and Geneva objected to the ORIX Plan. ORIX objected to the Debtor's Plan. In addition, ORIX objected to the proof of claim filed by Geneva, arguing that it should be disallowed or subordinated to an equity position.

The Debtor was represented by Scott Belden, Esq., Geneva by Tracy Green, Esq., and ORIX by Robert Kaplan, Esq. and Joseph Demco, Esq.

For the reasons discussed below, the court concludes that the ORIX Plan can be confirmed. The Debtor's Plan cannot be confirmed because it is not feasible under 11 U.S.C. § 1129(a)(11) and does not satisfy the best interests test of 11 U.S.C. § 1129(b).

Geneva is allowed an unsecured claim of $1,091,000, but that claim is contractually subordinated to the claims of the estate's general unsecured creditors.

## II. FACTS[1]

### A. The Debtor

The Debtor operates a lodge and suite hotel on adjacent properties located at 1150 and 1249 Lighthouse Avenue, Pacific Grove, California, called the "Lighthouse Lodge." The Debtor is a limited liability company. The members of this LLC, according to the Third Amendment to the Restated and Amended Operating Agreement of Lighthouse Lodge, LLC dated January 31, 2008 (the "Third Amendment"), are Carl Miller (20%), Benetta Johnson (27.294%), Jacci Pflieger (26.353%), and Sheri Pflieger (26.353%). The Debtor filed this chapter 11 case on April 9, 2009. Since that time, it has been attempting to sell the Lighthouse Lodge or refinance the property while it continues to operate.

### B. The Loan

On September 16, 1998, the Debtor borrowed $9.3 million from Nationsbank, N.A., executing a note promising to repay that sum (the "Loan"). The Loan was secured by the Lighthouse Lodge. Through a series of assignments of the Loan and underlying security interests,

---

[1] The following discussion constitutes the court's findings of fact and conclusions of law. Fed. R. Bankr. P. 7052(a).

ORIX became the holder of the Loan and the beneficiary of the security interests. On February 21, 2003, the Debtor filed a chapter 11 case in the Eastern District of California styled *In re Lighthouse Lodge, LLC*, Case No. 03-11635-A-11 (the "2003 Case") As part of that proceeding, the Loan was restructured. ORIX continues to hold the deed of trust.

Notwithstanding the restructuring of the Loan in the 2003 Case, the Debtor defaulted on the Loan. It failed to make monthly payments due on December 1, 2008, January 1, 2009, and February 1, 2009.[2] As a result of the default, ORIX accelerated the Loan and filed a complaint in Monterey County Superior Court seeking, among other things, the appointment of a receiver.

The Debtor filed this case to stall the foreclosure and reorganize. On May 3 and 4, 2010, the Debtor and ORIX filed competing plans of reorganization, which are described in detail below. The Debtor and ORIX used a Joint Disclosure Statement filed May 3, 2010 (the "Joint Disclosure Statement") to solicit votes on their plans. The votes have been tabulated and the parties agree either plan has sufficient votes to be confirmed under § 1126.

B.   Geneva Claim

On August 9, 2010, Geneva filed an amended proof of claim (the "Geneva Claim") asserting that the estate owes it $4,476,748, plus unspecified interest and late fees. The proof of claim arises from a complicated set of facts beginning with the 2003 Case.

An important part of the plan of reorganization confirmed in the 2003 Case provided that the Debtor would receive $4.0 million in new funds. The plan provided that Carl Miller or his affiliate Geneva would provide $3.0 million. Miller (or Geneva, it is not clear which) also lent Benetta Johnson $1.0 million, which she then contributed to the Debtor.

Whether the contribution of $3.0 million was a loan or was equity is the subject of considerable debate between ORIX and Geneva. In January 2008, the Debtor's LLC members executed the Third Amendment, which stated the $3.0 million contribution from Geneva was a loan, not an investment. ORIX objected to the Geneva Claim, insisting the $3.0 million was an

---

[2]   At trial, the Debtor asserted that ORIX improperly prohibited it from using funds held in reserve for lean winter operating months to make the December 2008 payment. It is clear from the Loan documents that the reserves were not intended to be used for defaults in December.

equity contribution and not a loan.  The solution to this question lies in a concession Geneva made in connection with confirmation:  Geneva has represented to the court that it will accept the treatment of the $3.0 million contribution as equity.[3]

The balance of the $4,476,748 Geneva Claim (in other words, the part that exceeds $3.2 million (Miller/Geneva's original contribution of $200,000, plus the $3.0 million later contribution) comes from sums advanced in 2008.  Initially, Geneva claimed this last advance was $1.5 million.  Geneva represented at trial, however, that the amount actually advanced was $1.091 million, not $1.5 million.  Accordingly, the court will use that number.

The facts surrounding the $1.091 million advance are murky, too.  No documentary proof of the payment being made was introduced at trial.  The Third Amendment states the funds were lent by Geneva – not Carl Miller – to the Debtor.  According to the testimony at trial, the money may have been used to renovate the Lighthouse Lodge, to make payments to ORIX, and for other uses.  At least $100,000 was used by one of the Debtor's affiliated companies, Lighthouse Lodge II, to purchase another property known as the Anton Inn.

The Debtor never signed a promissory note agreeing to repay the $1.091 million advance. The original loan papers named the Debtor as the borrower but the Debtor asked that they be altered to show the Debtor's affiliate, Lighthouse Lodge II, as the borrower.  This was done because the ORIX loan documents prohibited the Debtor from borrowing money.  The Debtor indicated that the terms of the loan are found in the promissory note that Lighthouse Lodge II signed.

The court finds the $1.091 million funding was a loan from Geneva to the Debtor.  While it is true the Debtor did not sign a promissory note, it is clear from the Third Amendment that the parties negotiated a loan and the Debtor would be responsible for repaying the money.  The Third Amendment provides that Miller will cause Geneva to increase its loan to the Debtor by $1.5 million.  While the Debtor's borrowing may have violated the terms of the ORIX loan, the Debtor

---

[3] If this concession does not extend to ORIX's plan, the court finds the purported conversion of $3.0 million from equity to debt was not effective.  The money was intended as capital and recharacterizing it to debt to improve Geneva or Miller's position was not permissible.

and Geneva had an understanding that it was a loan for $1.091 million and would be repaid.

The Geneva loan is not entitled to equal treatment with other unsecured creditors because the loan is contractually subordinated. Section 5.4.1 of the Third Amendment provides that in the event of sale or disposition of the Debtor's assets, the Geneva Real Estate, Inc. Loan (of which the $1.5 million addition forms a part) is subordinated to both the ORIX loan and "third parties." Only after both ORIX and the general unsecured creditors have been paid may the Geneva loan be paid.

### C. The Plans

Both parties amended their plans but the court finds those amendments are not substantive and do not require re-voting under 11 U.S.C. § 1127(a).

#### 1. The Debtor's Plan

In general terms, the Debtor's Plan provides for a sale or refinance of the Lighthouse Lodge by October 1, 2012. Pending that sale or refinance, the Debtor's existing management will operate the Lighthouse Lodge.

The Debtor's Plan provides for payment in full on the effective date for unclassified claims and Class 1 priority claims. Class 2 includes the ORIX claim. The Debtor's Plan provides for payments on this claim amortized over 360 months at 9% interest, or $72,541.40 per month. ORIX retains its lien but the maturity of this loan is extended to October 1, 2012, in anticipation of the proposed sale or refinance. The Debtor's Plan deletes some reserve accounts (for maintenance and insurance) otherwise required by the loan documents. Class 2B, the Monterey County property tax claim, is to be paid "as incurred." Classes 3 and 3A – personal property secured claim holders – will retain their liens and receive regular payments going forward. Class 4 is comprised of executory contract claims and the Debtor believes it has none of these. Class 5, general unsecured creditors, will share monthly payments that vary from $4,720 to $6,720, and will receive a lien on the Lighthouse Lodge that is subordinate to ORIX. Their claims will be paid in full at the time of sale or refinance if they have not been paid before that date. Class 6 is the Geneva Claim. Under the Second Modification to the Debtor's Plan, $3 million of this claim is

treated as equity. The balance (estimated in the Debtor's Plan at $1.3 million, but actually $1.091 million as noted above) is to be paid at the time of the sale or refinance at 7% interest but is entitled to a lien on the Lighthouse Lodge that is junior to ORIX and the unsecured creditors' liens.

### 2. The ORIX Plan

The ORIX Plan provides for a prompt sale of the Lighthouse Lodge by a liquidating agent nominated by ORIX. Pending that sale, the Lighthouse Lodge will be operated by a property management company. ORIX will provide funds to ensure that both the liquidating agent and the property manager are paid, but it will add those advances to its loan balance, and that balance will continue to accrue interest and late charges.

The ORIX Plan proposes to pay in full on the effective date the unclassified claims, Class A1, and general priority claims. Class A2, gift certificate holders, may use their gift certificates at the Lighthouse Lodge until it is sold. After that, they will be paid the remaining balance in cash. Class B1 consists of the ORIX claim. This claim is impaired. Pending sale of the Lighthouse Lodge, the Class B1 claim will only be paid adequate protection payments equal to the amount due under the promissory note; if there are insufficient funds to make that payment, ORIX will only be paid the available cash. Class B2, a claim secured by personal property, will be treated as an unsecured creditor and paid in full. Class B3, other personal property secured claims, will be paid the full value of the security on the effective date, and any deficiency will be treated as an unsecured claim and paid in full. Class C1 consists of general unsecured claims. These will be paid in full on the effective date. Class C2 consists principally of the Geneva Claim. This claim is impaired and will only be paid if the price at which the Lighthouse Lodge sells is sufficient to pay the ORIX claim in full (including the addition of the unclassified, priority, and secured and unsecured claims in Classes A2, B2, B3, and C1). Finally, Class D consists of the member interests in the Debtor. These interests will only be paid any funds remaining after Class C2 has been paid. All advances by ORIX are to be added to its loan balance and will accrue interest at the default rate.

D.    Projected Financial Results Under the Debtor's Plan

The parties spent considerable time at trial reviewing the likely financial results for Lighthouse Lodge over the course of the Debtor's Plan. Because the ORIX Plan calls for almost immediate sale, the Lighthouse Lodge's ability to generate short term profits is not of significant concern. The Debtor, on the other hand, must demonstrate that it can operate Lighthouse Lodge at a particular profit level for its plan to be feasible. The court finds the Debtor's financial projections are exaggerated in light of the property's historical results and reasonable expectations about the economy and the lodging industry.

Financial results for a lodging property like Lighthouse Lodge are driven by several factors. Most obviously, they are driven by the percentage occupancy the property achieves. That is, how full the property is on any given night. Occupancy is only important, however; it is not controlling. The rate charged for each room (the average daily rate or "ADR") is also significant because if the property is undercharging for rooms, no increase in occupancy can improve financial results. The most important factor, however, is known as "revenue per available room" ("RevPAR"). This measure indicates how much revenue the property can generate for each room that it has available. In the lodging industry, RevPAR is used to calculate how much revenue a property will generate over a given length of time. The number of rooms available over the course of a year multiplied by RevPAR supplies the total room revenue. Deducting the direct operating costs from that number yields the property's Gross Operating Profit and Gross Operating Profit Percentage. Deducting property taxes, insurance, and equipment purchases from the Gross Operating Percentage yields the Net Operating Income. Long term debt service is paid from Net Operating Income; thus, if Net Operating Income is too small, long term debts cannot be paid.

The summary set out below shows how the difference in RevPAR estimates affects the projection of financial viability. The Debtor estimates that RevPAR will average $89 range in 2011. ORIX estimates RevPAR at $83. Using the Debtor's figures, the property will generate $231,286 in revenue above ORIX's estimate. As discussed below, the court concludes that ORIX's estimates of revenue are more accurate and therefore a better measure of future

performance. Orix's projections show the Debtor does not have sufficient income to cover its obligations under the Debtor's Plan.

| Financial Forecasts -- Lighthouse Lodge LLC | Debtor's Projection 2011 | ORIX's Projection 2011 |
|---|---|---|
| Rooms Available | 34,765 | 34,765 |
| Rooms Sold | 25,202 | 25,202 |
| Average Daily Rate | $123.14 | $113.96 |
| Rev. per Avail. Room | $89.27 | $82.83 |
| Room Revenue | $3,103,356 | $2,872,070 |
| Total Revenue | $3,284,811 | $3,053,524 |
| | | |
| Gross Operating Profit | $1,407,508 | $1,098,500 |
| GOP % | 42.80% | 36.00% |
| Total Fixed | $190,004 | $201,507 |
| Equipment | $11,503 | |
| Net Operating Income | $1,206,001 | $896,993 |
| | | |
| Orix Payment | $858,509 | $919,746 |
| Unsecured Creditor Payment | $68,640 | $68,640 |
| Geneva Payment | $0 | $0 |
| Pacific Grove Payment | $132,960 | $132,960 |
| Income after Debt Obligations | $145,892 | ($224,353) |

footnote [4]

The Debtor's estimates have proven unreliable in the past. Exhibit A to the Joint Disclosure Statement sets forth the Debtor's actual and projected ADR for the period January to December 2010. The figures for January through April 2010 are actual figures while May through the balance of 2010 were estimated at the time the Joint Disclosure Statement was filed. The Debtor's projected ADR for the period April 2010 through September 2010 exaggerated the actual results achieved by between 9% and 25% based on actual figures at the time of trial, as follows:

| ADR | April | May | June | July | August | September |
|---|---|---|---|---|---|---|
| 2010 Estimated | 100.73 | 112.16 | 166.59 | 148.51 | 165.00 | 127.80 |
| 2010 Actual | 92.05 | 99.56 | 131.97 | 119.97 | 124.46 | 100.71 |
| | | | | | | |
| % Difference | -9% | -11% | -21% | -19% | -25% | -21% |

---

[4] See Debtor's Exhibit I (2011 projections) and Orix's Exhibit 61 (page 2 of the expert report of Jeffrey Kolessar).

ORIX's prediction for future RevPAR, on the other hand, is consistent with the property's historical results. From 2007 to 2009, RevPAR at the Lighthouse Lodge dropped from $85.69 to $77.69, and its Gross Operating Profit Percentage dropped from 46.9% to 29.6%. The Debtor's RevPAR projection for 2010 is approximately $80.36 and the Gross Operating Profit Percentage is expected to be 34.55%. ORIX's estimates track these results carefully.[5] It estimates that RevPAR for 2011 will be $84.37 and that the Gross Operating Profit Percentage will be 36%. In 2012, ORIX estimates that RevPAR will be $91.17 and that the Gross Operating Profit Percentage will be 40.5%.

By contrast, for 2011 the Debtor estimates that the property's RevPAR will be $89 and its Gross Operating Profit Percentage will be 42.8%. For 2012, the Debtor estimates that RevPAR will increase to $94 and Gross Operating Profit Percentage to 43%.

The market does not support the Debtor's higher estimates for revenue. The court accepts the expert testimony at trial offered by ORIX that Lighthouse Lodge outperforms the market in terms of occupancy but lags significantly in terms of RevPAR. ORIX's expert determined that Lighthouse Lodge's RevPAR for 2011 and 2012 should be calculated at between 88.3% and 93% of the Metropolitan Standard Area's results. For 2011 and 2012, the MSA standard for RevPar is $95.54 and $100.32, respectively. ORIX later reduced its estimates due to the Debtor's weak performance in August and September 2010, months for which it had overestimated revenue by more than 20%. The court accepts this methodology as an accurate means of predicting the property's future results, and finds ORIX's projections of income to be a reliable gauge of future revenue performance.

The Debtor has also underestimated future expenses. In the Joint Disclosure Statement, the Debtor used a set of expected expenses for its projections. Prior to trial in this matter, the Debtor amended the expense projections set forth in the Joint Disclosure Statement downward. ORIX's expert identified three categories of expense the Debtor adjusted: Administrative and General

---

[5] ORIX's expert's calculation of RevPAR for 2011 was off by a small amount due to a multiplication error in calculating the 5% annual rise. The difference is not material to the court's conclusions.

(15.6% decrease), Total Sales Expense (13.0% decrease) and Total Utilities (6.9% decrease). The Debtor offered testimony that at times in the past it was able to achieve these lower expense levels in the categories identified. The court finds it would be unlikely that three "best case" scenarios can be achieved simultaneously, as the Debtor suggests. Instead, the court finds that ORIX's estimate for expenses – which were taken directly from the Debtor's original projections in Joint Disclosure Statement – to be a reliable measure of future expenses.

E. Marketing Time for Sale of Lighthouse Lodge under the ORIX Plan

The ORIX Plan provides that the property will be sold at a public auction. The sale will be held no more than 120 days from the effective date of the plan and the closing of that sale must be completed within 30 days. Bidders must pre-qualify to bid and must submit an earnest money deposit of $500,000. The minimum bid is set at no less than 95% of the ORIX debt.

The court determines that the proposed sale of the Lighthouse Lodge provides a reasonable opportunity to market and sell the property and to obtain a reasonable price. The sale procedures are a now-familiar part of any asset sale under 11 U.S.C. § 363. The testimony at trial confirmed that the proposed sale would be properly marketed, provided sufficient time for buyers to pre-qualify, and was being regularly conducted. The timing of the closing of the sale is short but the court finds it is sufficient to permit closing in view of the pre-qualification procedures. The property has been on the market at least since the inception of the bankruptcy case and has not sold. The proposed auction is an appropriate means of disposing of the property.

**III. DISCUSSION**

**CONFIRMATION STANDARDS**

A plan must satisfy 11 U.S.C. § 1129(a)(1) to (16) to be confirmed. If a class of creditors rejects the plan, it can be confirmed only if the standards of 11 U.S.C. § 1129(b) are met. In the absence of objections a presumption that a plan has been proposed in good faith arises. Fed. R. Bankr. P. 3020(b)(2).

A. § 1129(a)(1) (Plan Complies with Bankruptcy Code)

Section 1129(a)(1) provides that a plan can only be confirmed if it complies with the

applicable provisions of this title. This is understood to mean the plan complies with the classification requirements of § 1122 and the permissible terms of a plan under § 1123.

The Debtor's Plan

The court concludes that the Debtor's Plan complies with § 1129(a)(1). Like claims are classified with like claims, the priority scheme appears consistent with applicable terms of the bankruptcy code, and the terms of the plan are permissible under § 1123(a). The court previously determined that the Debtor's use of a non-default interest rate for ORIX's claim is permissible under § 1123(a)(5)(G) and (H).[6]

ORIX's Plan

The court concludes that ORIX's Plan complies with the § 1129(a)(1). The Debtor and Geneva objected to the ORIX Plan's classification of the Geneva Claim because that claim is not going to be paid at the same time as other unsecured claims. As noted above, the Geneva Claim is contractually subordinated to other unsecured claims. This classification is consistent with the law. The Geneva Claim is not like other unsecured claims. It is entirely proper to separately classify a claim that is different from other claims. 11 U.S.C. § 1122(a). Indeed, the Debtor's Second Amended Plan of Reorganization treats the claim as subordinated. The other provisions of the ORIX Plan comply with §§ 1122 and 1123.

B. § 1129(a)(2) (Proponent Complies with Bankruptcy Code)

The court will only confirm a plan if the "proponent of the plan complies with the applicable provisions of this title." 11 U.S.C. §1129(a)(2). This requirement is designed to ensure that the plan proponent has made the appropriate disclosures and complied with the solicitation requirements set forth in § 1125. *Andrew v. Coppersmith (In re Downtown Inv. Club III)*, 89 B.R. 59, 65 (BAP 9th Cir. 1988). Because both the Debtor and ORIX relied on the court-approved Joint Disclosure Statement to solicit votes on their plans, they have satisfied this provision.

---

[6] Memorandum Decision on Objections to Confirmation of Chapter 11 Plans filed October 14, 2010.

### C. § 1129(a)(3) (Good Faith)

The plan must be proposed in good faith and not by any means forbidden by law. 11 U.S.C. §1129(a)(3); *see In re Stolrow's Inc.*, 84 B.R. 167 (BAP 9th Cir. 1988).

#### Debtor's Plan

ORIX contends the Debtor's Plan fails the good faith test because it provides the same treatment for unsecured claims as it affords to the Geneva Claim and provides for an extension of the maturity date of the ORIX loan. The court overrules this objection. Extending the maturity date of the loan is consistent with 11 U.S.C. § 1123(a)(5)(H), and a plan may contain any provisions consistent with the bankruptcy code. 11 U.S.C. § 1123(b)(6). The proposed treatment of the Geneva Claim does not violate § 1129(b)(2).

#### ORIX's Plan

The Debtor and Geneva both object to confirmation of the ORIX Plan on the grounds that it fails to meet 11 U.S.C. § 1129(a)(3). The thrust of the objections is that the proposed auction sale of the property is not designed to maximize the return on the sale of Lighthouse Lodge and that the ORIX Plan benefits ORIX above all other creditors.

The court finds the ORIX Plan satisfies § 1129(a)(3). In the simplest terms, the ORIX Plan calls for a sale of the Lighthouse Lodge. The sale of estate property is permitted in chapter 11 plans of reorganization. Section 1123(a)(5)(D) states that a plan of reorganization may provide for the "sale of all or any part of the property of the estate." Section 1123(b)(5) provides that a plan may "provide for the sale of all or substantially all of the property of the estate, and the distribution of the proceeds of such sale among holders of claims or interests."

The sale procedures proposed for the Lighthouse Lodge are not extraordinary in the context of either a foreclosure or a bankruptcy case. The property will be auctioned to the highest bidder at a public auction to be confirmed by the court. Given the long time that the property has been on the market, an auction is a reasonable means of proceeding.

### D. § 1129(a)(4) (Issuance of Securities)

Pursuant to § 1129(a)(4), any payment to be made by a plan proponent, debtor, or person

issuing securities or acquiring property under a plan, for services or costs in connection with the case or in connection with a plan and incident to the case, must be approved by the court as reasonable. Both the Debtor's Plan and the ORIX Plan satisfy this standard.

### E. §1129(a)(5) (Identity of Management)

Pursuant to § 1129(a)(5), a plan must disclose the identity and affiliations of any individual proposed to serve as a director, officer, or voting trustee of the debtor. The appointment or continuation in occupation of such a person must be consistent with the interests of creditors and equity security holders and with public policy. If an insider will be employed by the reorganized debtor, the plan proponent must disclose that fact. Both the Debtor's Plan and the ORIX Plan satisfy this standard because they both disclose the identity of the management of the estate post-confirmation and indicate whether management consists of insiders. The court finds the appointments to be consistent with the interests of creditors, equity holders, and public policy.

### F. §1129(a)(6) (Regulatory Approval)

Under this provision, any governmental regulatory commission with jurisdiction over the reorganized debtor must approve any rate change provided for in the plan. Because neither of the plans under consideration involves regulatory oversight, they satisfy this standard.

### G. §1129(a)(7) ("Best Interests of Creditors Test")

Section 1129(a)(7) provides that each holder of an impaired claim must either vote in favor of a plan or receive – on account of its claim – at least the same return that it would get if the case were a chapter 7 liquidation. Geneva is impaired and voted against the ORIX Plan, so the section nominally applies to it.

#### Debtor's Plan

The court finds that the Debtor's Plan meets the best interests test because it provides for liquidation or refinance of the property over approximately 24 months. In the meantime, the Debtor's Plan calls for adequate protection payments to ORIX and monthly payments to unsecured creditors (except Geneva).

ORIX's Plan

The Debtor and Geneva contend the ORIX Plan does not meet the "best interests of creditors" test in § 1129(a)(7) because the proposed sale does not guarantee that Geneva will be paid anything on its claim in the proposed auction sale. They argue that a longer sale process is necessary to ensure Geneva gets its due.

The fault in this argument lies in the assertion that the proposed sale of the Lighthouse Lodge under the ORIX Plan is substantially different from a sale in chapter 7. In a chapter 7, a bankruptcy trustee would be appointed to supervise the sale of the Lighthouse Lodge. While the trustee has some limited ability to operate property in chapter 7 under 11 U.S.C. §§ 704(a) and 721, it is the court's experience that trustees are reluctant to operate businesses given concerns about cash collateral and liability. Thus, if the case were converted to chapter 7, the likely result would be (1) the trustee would walk away from the property, leaving the creditor to foreclose, or (2) the trustee would attempt to sell the property using expedited procedures. In a hypothetical chapter 7 case, then, Geneva likely would receive the same treatment it is getting under ORIX's Plan: immediate sale of the property. *See In re Sierra-Cal*, 210 B.R. 168 (Bankr. E.D. Cal. 1997).

The court finds the treatment provided by the ORIX Plan to be the substantive equivalent to a chapter 7 liquidation. The property has been on the market since 2008 and no sale has been consummated. The liquidating agent will market the property. He testified convincingly that the four month marketing period is sufficient time for a satisfactory sale. The court therefore determines that the ORIX Plan satisfies the best interests test.

H.  §1129(a)(8) and §1129(a)(10) (Voting)

The plan proponent must show that each class has either accepted the plan or is unimpaired. A class of claims has accepted a plan if it has been accepted by creditors that hold at least two-thirds in amount and more than one-half in number of the allowed claims of such class. 11 U.S.C. §1126(c). Moreover, if a class of claims is impaired under a plan, at least one class of claims that is impaired under the plan must accept the plan, exclusive of any acceptance by a plan insider.

The parties have agreed that each plan has at least one impaired class and each plan has an impaired consenting class. The court previously ruled that ORIX is not an 'insider' under its own plan of reorganization. Thus, it is entitled to vote as an impaired consenting creditor under its own plan. The court therefore finds the requirements of § 1129(a)(8) and (10) are met.

I. §1129(a)(9) (Payment of Administrative Claims)

In order to satisfy this provision, administrative claims arising under 11 U.S.C. § 507(a)(2) and (3) claims (which include § 503(b) claims) must be paid in full on the effective date unless otherwise agreed. Other priority claims under § 507(a) may be paid over life of plan if they accept it, but if not, must be paid on confirmation. Both plans make appropriate provision for administrative claims under § 1129(a)(9).

J. §1129(a)(11) (Feasibility)

Section 1129(a)(11) requires a finding that the confirmation of a plan of reorganization is not likely to be followed by the liquidation, or the need for further reorganization of the debtor. In other words, a plan must be feasible to be confirmed. *Pizza of Hawaii, Inc. v. Shakey's, Inc., (In re Pizza of Hawaii, Inc.)*, 761 F.2d 1374 (9th Cir. 1985). A plan is feasible if it has a "reasonable probability of success" and is not a "visionary scheme." *In re Acequia, Inc.*, 787 F.2d 1352, 1364 (9th Cir. 1986).

Debtor's Plan

The court concludes the Debtor's Plan is not feasible. According to projections made by ORIX's expert, which the court has concluded are reliable and supported by the evidence at trial, the operating income generated by the Lighthouse Lodge over the course of the plan will not be sufficient to cover all payments required under the plan. Indeed, the projections indicate if the Debtor made all payments required by its plan, it would have a cash deficit of $224,354 by the end of 2011, and a cash deficit of $30,226 by September of 2012, after which the property must be sold or refinanced. In other words, the Debtor will not have sufficient income over the course of its plan to make payments to creditors. The court notes this holds true even though the Debtor has attempted to conserve cash by eliminating monthly payments to Geneva, and by refusing to

maintain reserves for furniture, fixtures, and equipment, and insurance, as required by the ORIX loan documents .

ORIX's Plan

ORIX's plan calls for the sale of the property at an auction. ORIX will advance any sums necessary to pay the claims of unclassified, priority, and unsecured creditors. The court finds the ORIX Plan feasible.

K.  §1129(a)(12) (Court Fees/U.S. Trustee Fees)

All fees payable under 28 U.S.C. §1930 must be paid or provided for on the effective date of the plan. The court finds both plans satisfy this requirement.

L.  §§ 1129(a)(13), (14), (15) and (16) (Retiree/Domestic Support/Individuals in Chapter 11, and Transfer Approvals)

These provisions, pertaining to retiree benefits, domestic support obligations, minimum payments by individual chapter 11 debtors, and non-bankruptcy law controlling transfers, do not apply to this matter.

M.  § 1129(b)(2) (Best Interests)

A plan can be "crammed down" on a class that votes against a plan if certain requirements are met. Under § 1129(b)(2), if all other provisions of § 1129(a) are met except the voting requirement, the plan can be confirmed if it does not discriminate unfairly and is "fair and equitable" to creditors. The burden of proof is on the plan proponent. *In re Stoffel*, 41 B.R. 390 (Bankr. D. Minn. 1984); *In re Agawam Creative Marketing Associates Inc.*, 63 B.R. 612 (Bankr. D. Mass. 1986).

Debtor's Plan

ORIX contends the Debtor's Plan is not "fair and equitable" because the loan has been repeatedly restructured, because the plan strips ORIX of protections required by the loan documents (notably, the reserves), and because there is significant risk of loss to ORIX in the Debtor's Plan if the property declines in value before it can be refinanced or sold. It is permissible, as noted above, to restructure a payment arrangement, so this objection cannot be sustained.

To be fair and equitable to a secured creditor, the creditor must retain its lien and receive deferred cash payments equal to its secured claim. *See* 11 U.S.C. § 506(a); § 1129(b)(2)(a)(II). The Debtor cannot prove it can make all the payments required under its plan. Moreover, if the Debtor fails to make those payments, ORIX must rely solely on the value of the property securing its claim. In addition, certain bargained-for reserves the Debtor would be required to maintain under the existing loan documents have been eliminated in the Debtor's Plan. The parties introduced scant evidence of the Lighthouse Lodge's value. On this record, the court cannot conclude that ORIX would be adequately protected under 11 U.S.C. § 361 over the nearly two year life of the plan. The risk remains that the Lighthouse Lodge's value may fall before the Debtor can sell or refinance the property. Under the circumstances, the court finds the Debtor's Plan does not meet the fair and equitable standard.

ORIX's Plan

The Debtor and Geneva contend the ORIX Plan does not meet the fair and equitable standard because (1) the sale process does not guaranty that Geneva's claim will be paid, (2) Geneva's claim is not being paid when other unsecured creditors are being guaranteed payment, (3) ORIX pays itself default interest under its plan, and (4) the release and exculpation clauses of the ORIX Plan are not lawful.

The court overrules this objection and finds the ORIX Plan is fair and equitable, as limited below. The court found in its October 14, 2010 Memorandum Decision that ORIX may be paid default interest under its plan. In the same decision, the court analyzed ORIX's plan releases and determined that they consist of two distinct releases rolled into one: a settlement or waiver of claims belonging to the Debtor and the estate within the meaning of 11 U.S.C. § 1123(b)(3)(A) and a release or limitation of liability of a party responsible for implementing the plan. As for the latter release, the court concluded that the release would be proper if it excepts gross negligence or willful misconduct. Thereafter, ORIX filed the Modification of ORIX Capital Markets, LLC Creditor's Second Amended Plan of Liquidation (dated November 5, 2010) (the "ORIX Plan Modification"), which omitted gross negligence and willful misconduct from the release and

exculpation clauses.  As for the "settlement" of the Debtor's or estate's claims against ORIX, the court held that ORIX had the burden of showing that the release is fair, equitable, reasonable, and in the best interests of the estate at the evidentiary hearing.  Even though the court is not aware of any claims against ORIX, ORIX still bears the burden to establish that the release, or "settlement," is reasonable and in the best interests of the estate.  *See In re A&C Properties*, 784 F.2d 1377, 1381-82 (9th Cir. 1986).  However, there was no testimony at trial on the reasonableness of the releases or how they are in the best interests of the estate.  Consequently, the court determines the release provided under 5.1.9 of the ORIX Plan cannot be approved.  Similarly, the definition of "Estate Causes of Action" needs to be modified accordingly.[7]

The court has already found the proposed auction sale of the property to be reasonable under the facts of this case.  The court has also found that treating Geneva Claim differently is warranted given the contractual subordination of that claim.  For these reasons, the ORIX Plan is fair and equitable under § 1129(b)(2).

### N. Choice of Plans

Because the court determines that the Debtor's Plan does not meet the feasibility requirement of § 1129(a)(11) or the cram down standard of § 1129(b)(2), it cannot be confirmed.  It is not necessary for the court to choose which plan should be confirmed under 11 U.S.C. § 1129(c).

## EQUITABLE SUBORDINATION OF GENEVA CLAIM

ORIX contends that the Geneva Claim must be equitably subordinated under the Fourth Circuit's reasoning in *Fairchild Dornier GmbH v. Official Com. of Unsecured Creditors.,* 433 F.3d 224 (4th Cir. 2006).  In that case – and others like it – the court provides a non-exhaustive list of factors that ought to be considered in determining whether a debt should be re-characterized as equity.  Generally speaking, the court can determine that a loan is more akin to equity when the form of the borrowing is not properly specified (as to interest rate, repayment terms, and the like),

---

[7] Section 8.2 of the ORIX Plan Modification is proper as determined by the Court's October 14, 2010 Memorandum Decision provided that the definition of "Estate Causes of Action" is modified as noted above.

there is identity of interest between the lender and borrower, the company's ability to borrow under usual terms is impaired, the purpose of the borrowing is improper, and when the payments required are not specified and are not made.

While a close call, the court does not find equitable subordination of the Geneva Claim is appropriate under the facts of this case. The testimony at trial indicated that the Debtor borrowed $1.091 million from Geneva, that it promised to repay the money, and that it would have signed a promissory note for the balance but for the requirement that it not borrow any money under the ORIX loan documents. Admittedly, the documentary record to support such a loan is poor. No promissory note exists for the loan. The supposed terms of the loan are found in the promissory note Lighthouse Lodge II signed (as it was intended that the Debtor would sign that note). However, the loan is referred to in the Third Amendment, which provides that the money is being lent by Geneva to the Debtor for "remodel/upgrade/refurbishment efforts." In addition, the money lent to the Debtor was advanced by Geneva, not its insider – the Debtor's LLC member Carl Miller. ORIX did not introduce substantial evidence at trial to demonstrate that the Debtor had no other source of funds at the time it borrowed from Geneva.

Accordingly the court declines to subordinate this claim to equity status. The court notes, however, that the Geneva Claim is subordinated contractually to all other unsecured claims.

## IV.  CONCLUSION

For the foregoing reasons, the court approves the ORIX Plan and denies confirmation to the Debtor's Plan. Counsel for ORIX may submit a form of order approving its plan so long as it removes the release provision discussed in section M, above.